Neal P. DuBois
DuBois Mills, PLLC d/b/a 406 Attorneys
P.O. Box 1348
Great Falls, Montana 59403
Ph: 406.315.3242
Fax: 406.727.1812
neal@406attorneys.com

-and-

Jesse Myers
MURPHYMYERS PLLC
P.O. Box 1619
Billings, Montana 59103-1619
Telephone: (406) 732-6868
Fax: (406) 204-4662
jesse@murphymyers.com

*Attorneys for the Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALL DIVISION

| | |
|---|---|
| JASON MADILL, TAMARA MADILL, and FOUR TEN CENTRAL LLC,<br><br>Plaintiffs,<br><br>vs.<br><br>T-MOBILE WEST LLC, DOES 1-4, AND X, Y, Z, COMPANIES,<br><br>Defendants/Third-Party Plaintiff,<br><br>vs.<br><br>LEGACY TELECOMMUNICATIONS, LLC,<br><br>Third-Party Defendants. | Cause No.: 4:24-cv-114-GF-SPW<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

COME NOW, the Plaintiffs, Jason Madill, Tamara Madill, and Four Ten Central LLC, by and through their counsel Neal P. DuBois of DuBois Mills, PLLC d/b/a 406 Attorneys and Jesse Myers of MurphyMyers PLLC, and for their First Amended Complaint against the Defendants T-Mobile West LLC, Does 1-4, and X, Y, X Companies, complain and allege as follows:

## GENERAL ALLEGATIONS

1. Jason Madill is a resident of Great Falls, Cascade County, Montana.

2. Tamara "Tammy" Madill is a resident of Great Falls, Cascade County, Montana.

3. Four Ten Central LLC is a Montana Limited Liability Company with its principal place of business located in Great Falls, Cascade County, Montana.

4. Defendant T-Mobile West LLC ("Defendant") is a Delaware Limited Liability Company with its principle place of business in the State of Washington. T-Mobile USA, Inc. is the sole member of Defendant.

5. The true names and capacities of Defendants named herein as Does 1 through 4 and Companies X, Y, and Z, inclusive, are currently unknown to Plaintiffs, who therefore bring this action against said Defendants by such fictitious names. Plaintiffs will seek leave to amend their Complaint to state the true names and capacities of said Defendants when the same have been ascertained, together with

further appropriate charging allegations. Plaintiffs are informed and believe and, therefore, allege that the fictitiously named Defendants may have caused and be legally responsible in some manner for the damages suffered by Plaintiffs and alleged herein.

6. Venue is proper in Cascade County, Montana, pursuant to Mont. Code Ann. §§ 25-2-122 and 25-2-122 because Cascade County, Montana, is the county in which Plaintiffs reside, the county in which the agreement between the parties was to be performed, and this is the county where the alleged tortious conduct occurred.

7. This Court has jurisdiction over all parties hereto and subject matter of this lawsuit. Plaintiffs' original Complaint was filed on October 1, 2024, in the Montana Eighth Judicial District Court, Cascade County, Cause No. DV-7-2024-0000489-NE. (Doc. 1-5). Defendant removed this matter to this Court on December 13, 2024, alleging "[t]here is complete diversity among all real parties, and Plaintiffs' state court complaint ("Complaint") alleges claims that exceed $75,000 in damages exclusive of interest and costs." (Doc. 1). All of Plaintiffs' claims against Defendant are governed by the substantive law of Montana.

8. Jason and Tammy purchased the real property and premises located at 410 Central Avenue in Great Falls, Cascade County, Montana on March 15, 2017. The real property and premises located at 410 Central Avenue in Great Falls,

Cascade County, Montana has been known as the "Strain Building" in the Great Falls community for many years.

9. Prior to Jason and Tammy purchasing the Strain Building, an appraisal was performed by certified appraiser Philip L.R. Rowen. Mr. Rowen's appraisal report is dated February 9, 2017, and Mr. Rowen certified the statements of fact contained in his report were true and correct and that his reported analyses, opinions, and conclusions were his "personal, impartial, and unbiased professional analyses, opinions, and conclusions." Mr. Rowen performed a personal inspection of the Strain Building and consulted with multiple people familiar with the property as part of his appraisal. Mr. Rowen's report states the wall finishes on the 6th floor of the Strain Building were "good quality paint and wall paper." Mr. Rowen's report further states the finishes at the Strain Building were "considered to be good and the improvements have been very well maintained." Regarding the roof at the Strain Building, Mr. Rowen's report states "[s]ome of the roof cover was upgraded within the past year and there was no interior evidence observed that would indicate there is any history of deficiencies of the roof cover." Mr. Rowen's appraisal report has been produced to Defendant.

10. Another appraisal of the Strain Building was performed by certified appraisers Bob Brown and Michael Miller in 2022. The appraisal report completed

by Mr. Brown and Mr. Miller is dated February 2, 2022, and these gentlemen certified the statements of fact contained in their report were true and correct and that their reported analyses, opinions, and conclusions were their "personal, impartial, and unbiased professional analyses, opinions, and conclusions." A personal inspection of the Strain Building was performed as part of Mr. Brown and Mr. Miller's appraisal. Mr. Brown and Mr. Miller's appraisal report states that the roof at the Strain Building had a membrane cover and notes no significant deferred maintenance was needed. Mr. Brown and Mr. Miller's appraisal report states the remaining economic life of the Strain Building and improvements was 30 years and was "based upon our on-site observations and a comparative analysis of typical life expectancies as published by Marshall and Swift, LLC, in the Marshall Valuation Service cost guide." Mr. Brown and Mr. Miller's appraisal report further states that "[r]oughly $3.7 million has been spent on tenant improvements and other capital expenses" by Jason and Tammy. Mr. Brown and Mr. Miller's appraisal report has been produced to Defendant.

11. Four Ten Central LLC assumed ownership of the Strain Building from Jason and Tammy on April 10, 2024.

12. Jason and Tammy are native Montanans. Jason grew up in Billings, Montana and graduated with a construction engineering degree from Montana State

University. Jason has extensive education, training, experience and expertise in commercial property and construction and engineering.

13. When Jason and Tammy purchased the Strain Building in 2017, the Ethylene Propylene Diene Monomer (EPDM) roof was in good condition, functioned properly, and did not leak or have any tears. When Jason and Tammy purchased the Strain Building, the EPDM roof on the Strain Building was a wind vented system designed and warrantied by the 2001 Company and installed by S/T Roofing.

14. After purchasing the property, Jason, Tammy and the entire Madill family began extensive efforts to redevelop and improve the Strain Building. The Madill family's redevelopment of Strain building has been a true labor of love by the Madill family and Jason and Tammy have always hoped the historic legacy of the Strain Building will continue for future generations of their family and the community of Great Falls, Montana. Every member of the Madill family has their fingerprints on their historic redevelopment of the Strain Building in numerous ways, including Jason and Tammy's five (5) children and Jason's elderly parents. The Madill family name is now prominently displayed on the Strain Building and Plaintiffs have formed a non-commercial and subjective relationship with the Strain Building on a person-identity level.

15. At the time Jason and Tammy purchased the Strain Building, a cellular tower was located on an elevated platform on the roof of the building, but it was not in use at the time Tammy and Jason purchased the property and premises.

16. On or about July 28, 2020, Jason and Tammy were contacted by Defendant through its agent, Craig and Associates (d/b/a CAA Wireless), and informed Defendant was interested in utilizing the existing cellular tower at the Strain Building for its network and began discussions about a possible site lease agreement.

17. Defendant's agent, Craig and Associates (d/b/a CAA Wireless), prepared a "Site Candidate Information Package (SCIP)" for the Strain Building that it submitted to Defendant. The SCIP includes multiple photos of the Strain Building, include the existing cellular tower and EPDM roof, which show the EPDM roof was in good condition and did not have any holes, tears, and/or punctures.

18. Because a cellular tower was already located on the roof of the Strain Building, Defendant and its agents represented to Jason that Tammy that installation of new cellular equipment on the existing cellular tower would be quick, timely, non-invasive, and would not disrupt any of the tenants at the property or any business operations. Given Defendant's experience with cellular installations and specialized knowledge of the work needed to install its new cellular equipment at

the Strain Building, Defendant knew these representations were false at the time they were made. Defendant intentionally concealed from Plaintiffs the full scope of work Defendant intended to perform at the Strain Building and that Defendant knew it intended to perform once a lease agreement had been executed. Defendant's concealment of these materials facts and Defendant's misrepresentations were made to Plaintiffs prior to the parties executing a lease agreement. Defendant's concealment of facts and false representations regarding the nature, scope, and quality of work that would be performed by Defendant at the Strain Building were not mere opinions or puffery, but knowingly false material statements. Defendant's concealment of facts and knowingly false misrepresentations were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

19. Defendant and its agents/contractors represented to Jason and Tammy that during installation of new cellular equipment on the existing cellular tower at the Strain Building, no workers or equipment were anticipated to be on the roof of the building, and all work would be performed only on the elevated platform where the cellular tower was located. Defendant and its agents/contractors further represented to Jason that Tammy that if unexpectedly any workers or equipment

needed to be on the roof of the building for any reason, protective matting would be placed on the roof to protect it from any damage. Given the nature of work Defendant knew it intended to perform at the Strain Building, Defendant knew that protective matting was necessary to protect the EPDM roof at the Strain Building from damage. However, Defendant knew its representations to Plaintiffs that if any workers or equipment needed to be on the roof of the building for any reason, protective matting would be placed on the roof to protect it from any damage, were false and Defendant never had any intention of utilizing protective mats at the time Defendant made these false representations to Plaintiffs. Defendant's false representations were not mere opinions or puffery, but knowingly false material statements. These knowingly false misrepresentations by Defendant were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

20. In 2020 and 2021 and prior to beginning work at the Strain Building, Defendant and its agents/contractors inspected the roof at the Strain Building, conducted multiple construction walk-throughs to audit and document any deficiencies with the roof on the Strain Building, and hired an engineer to inspect the roof. Defendant hired engineer Mark Olson, who inspected and evaluated the

condition of the roof at the Strain Building in 2020. During his inspection and evaluation of the roof at the Strain Building, engineer Olson took over 100 photos of the Strain Building, including the roof, which Plaintiffs were only provided after serving engineer Olson with a subpoena duces tecum. The photos taken by engineer Olson show the EPDM roof at the Strain Building was in good condition and did not have any holes, tears, and/or punctures. Engineer Olson confirmed the EPDM roof at the Strain Building was in "excellent condition" in a subsequent email to Defendant's employee and Senior Project Manager Sean Connors and others, stating: "the existing roof looked to be fairly new and in overall excellent condition...the roofing seal around the platform column supports look to be in excellent shape...the roof is far from needing replaced[.]" Engineer Olson also stated that property owners have "many times correctly" blamed Defendant for causing roof damage during the construction phase. A copy of engineer Olson's email containing these statements was sent to Jason by email on February 3, 2023, which is the first time Plaintiffs were ever made aware of this information.

21. Defendant and its agents/contractors represented to Plaintiffs there would be no radio waves, no radiation, and that no other condition which would be considered dangerous or detrimental or would pose any limitation to roof access after installation of Defendant's new cellular equipment had been installed at the Strain

Building. In an August 2, 2020, email to Defendant's agents with Craig and Associates (d/b/a CAA Wireless), and almost a year prior to execution of a lease agreement, Jason specifically asked if any equipment Defendant wanted to install at the Strain Building would create any radiation or anything that could be considered detrimental. Given its experience with cellular equipment and networks, Defendant and its agents/contractors knew the equipment it intended to install at the Strain Building would cause and emit radiofrequency radiation and require warnings and special precautions. Instead of disclosing these material facts to Plaintiffs and in response to Jason's specific email asking for this information, Defendant and its agents/contractors instead concealed the true material facts and made knowingly false representations. Defendant and its agents/contractors falsely represented to Plaintiffs that Defendant's equipment posed no danger, no radiation or radio waves would be emitted by Defendant's cellular equipment, and no warnings or special precautions would be required at the Strain Building once Defendant completed installing its cellular equipment. Defendant's concealment of material facts and false representations were not mere opinions or puffery, but knowingly false material statements. Defendant's concealment of material facts and knowingly false misrepresentations were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement,

and allow Defendant to gain an unfair advantage over Plaintiffs. For years prior to making these false representations to Plaintiffs, Defendant knew its equipment emitted radiofrequency radiation, the dangers it created, and special precautions it necessitated. In Defendant's Form 10-K filed with the United States Securities and Exchange Commission, dated February 6, 2020, Defendant reported:

> Allegations have been made that ... wireless transmission equipment, such as cell towers, may be linked to various health concerns, including cancer and brain tumors. Lawsuits have been filed against manufacturers and carriers in the industry claiming damages for alleged health problems arising from the use of wireless handsets. In addition, the FCC has from time to time gathered data regarding wireless handset emissions and its assessment of this issue may evolve based on its findings....Any of these allegations or risks could result in customers purchasing fewer devices and wireless services, and could also result in significant legal and regulatory liability.

22. Laws and regulations prohibit Defendant from making materially false or misleading statements on Form 10-K. Likewise, Defendant is prohibited from omitting material information that is needed to make its Form 10-K form not misleading. Upon information and belief, Defendant had been involved in multiple lawsuits related to the radiofrequency radiation emitted by its cellular equipment prior to contacting Plaintiffs about the Strain Building on or about July 28, 2020. Defendant knew that the radiation emitted by its equipment required warnings and special precautions before Plaintiffs were ever contacted by Defendant's agent, Craig and Associates (d/b/a CAA Wireless). None of this information was ever

disclosed to Plaintiffs prior to execution of the Site Lease Agreement and Defendant even refuses to provide this information in response to Plaintiffs' formal written discovery served in this litigation.

23. Defendant represented to Jason and Tammy that all employees, agents, and contractors performing installation of Defendant's cellular equipment on the tower would be competent, qualified, experienced, would be supervised by Defendant, and all work would be performed in a professional and workmanlike manner. Upon information and belief, Defendant had been sued multiple times by property owners alleging Defendant and its agents/contractors had caused damage and/or destroyed the roof on private property during installation work related to its cellular equipment prior to contacting Plaintiffs about the Strain Building on or about July 28, 2020. Defendant's own engineer, Mark Olson, admitted property owners have "many times correctly" blamed Defendant for destroying and damaging roofs during cellular installation work. None of this information was ever disclosed to Plaintiffs by Defendant prior to execution of the Site Lease Agreement. Defendant's false representations about the quality of work that Defendant would perform at the Strain Building were not mere opinions or puffery, but knowingly false material statements. These knowingly false misrepresentations by Defendant were intentional and used by Defendant to create false impressions, deceive and

mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

24. Based on the false promises and misrepresentations of Defendant and its agents/contractors, Jason and Tammy entered into a "Site Lease Agreement" with Defendant on June 3, 2021. A copy of the executed Site Lease Agreement is attached hereto as **Exhibit "A"**.

25. Paragraph No. 10 of the Site Lease Agreement states that if the building or adjacent building areas are damaged or destroyed by Defendant or its contractors or representatives during the construction of the antenna facilities, Defendant shall be required to coordinate and pay for any applicable repairs. Defendant never had any intention of complying with this contractual provision and knew that if any damage was caused to the Strain Building during the installation of its cellular equipment, it would blame its agents/contractors and Plaintiffs. At the time Defendant's Market Manager Brian Tucci signed the lease on behalf of Defendant on April 12, 2021, Defendant knew it had no intention of ever complying with the provisions contained in Paragraph No. 10 of the Site Lease Agreement and instead falsely represented to Plaintiffs that Defendant would in fact do so. Defendant's false representations and concealment of its true intentions with respect to the obligations contained in Paragraph No. 10 of the Site Lease Agreement were not

mere opinions or puffery, but knowingly false material misrepresentations. These knowingly false misrepresentations by Defendant were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

26. After Defendant and its agents/contractors began work to install the new cellular equipment on the tower, Tammy and Jason were continually disrupted by the work being done. On October 4, 2022, the control room on the 6th floor of the building that houses much of the computer equipment for the building (which controlled the automatic door, elevator, and lighting systems) experienced water damage from a roof leak due to large cuts, tears, and holes in the EPDM roof caused by Defendant and its agents/contractors. Tammy and Jason reported this damage to Defendant and its agents/contractors, but their concerns were ignored. Eventually, Defendant and its agents/contractors told Tammy and Jason someone would repair the roof damage, but it was never done. Although EPDM roofing is not within his expertise, which Jason informed Defendant and its agents/contractors, Jason took it upon himself to try and make the necessary repairs to prevent further damage to the roof and interior of the Strain Building.

27. Following the discovery of water damage on October 4, 2022, Jason's concerns grew regarding the work being done on the roof by Defendant and its agents/contractors. Sometime in November of 2022, a large communication box Defendant and its agents/contractors left standing and unsecured on the cellular tower platform fell over, ripped and tore the roof, and then became frozen to the roof due to a winter storm. Defendant and its agents/contractors did not remove the communication box from the roof for a month. This caused water from melting snow and ice to be diverted under the roof's membrane and into the substrate, causing substantial damage. Defendant and its agents/contractors ignored and left this damage unrepaired until attempting to patch the damage with gorilla tape and Flex Seal, which is not recommended for use on an EPDM roof.

28. Jason and Tammy also observed the work on the roof by Defendant and its agents/contractors was much more extensive, significant, impactful and disturbing than had been represented by Defendant prior to execution of the Site Lease Agreement. Defendant and its agents/contractors trampled all over the roof in their work boots pushing heavy and overloaded dollies, rolling large spools of wire, and overloading the roof with heavy pallets, tools, and equipment. All of this work was done, despite prior representations that no workers or equipment were anticipated to be on the roof of the Strain Building and if unexpectedly any workers

or equipment needed to be on the roof for any reasons, protective mats or other adequate preventative measures being utilized on the roof to protect it from damage, as Defendant and its agents/contractors previously and falsely promised.

29. Defendant and its agents/contractors left debris, garbage, screws, parts, tools, and equipment scatted about the roof at all times. Defendant and its agents/contractors then walked over these items through snow and ice on the roof, which caused numerous punctures and substantial damage.

30. Defendant and its agents/contractors drug heavy cables across the roof that were tangled up in screws, nails, and staples which caused punctures and substantial damage. They also dropped or threw heavy and sharp items from the elevated cellular tower onto the roof, which caused substantial damage.

31. Defendant and its agents/contractors placed extremely heavy items on the roof, including large fiberoptic spools of wire, batteries, structural steel, communication boxes, and brackets which overloaded the membrane roof causing punctures and tears as well as causing substantial damage to the substrate.

32. Defendant and its agents/contractors left heavy items sitting on the roof for extended periods of time and transported heavy materials around and across the roof on dollies and without any protective mats. These activities created ruts, dents, divots and depression in the roof, causing substantial damage.

33. Defendant and its agents/contractors pried old conduit and clamps out of the masonry parapet on the roof leaving holes and damage.

34. The lack of care during the installation and work by Defendant and its agents/contractors resulted in the destruction of the roof with 177 instances of piercings, holes, lacerations, tears and places where the roofing has been pulled away from the building. This damage, caused by Defendant and its agents/contractors, has resulted in significant water damage to the roof and interior of the building.

35. Jason and Tammy relayed their concerns about the destructive work being done by Defendant and its agents/contractors to Defendant and its agents/contractors many times and their concerns were largely ignored. During a meeting with Defendant's agents/contractors at the property on January 11, 2022, Jason pointed out the damage caused by the work being done but was told "there is not much we can do to patch this turd of a roof you have here." Similarly, when Defendant's project manager reported Jason and Tammy's concerns to Defendant's employee and Senior Project Manager Sean Connors, he responded by saying Jason "has been a turd the entire time we've been dealing with this site" and that Jason and Tammy's concerns were "nonsense."

36. Defendant's and its agents/contractors then began promising Plaintiffs it would repair the damages caused during the work, telling Plaintiffs a roofer would

be contacted and scheduled to make the necessary repairs. These promises were knowingly false and misleading. Defendant's agents/contractors first hired Ace Roofing, LLC to repair damage caused to the roof of the Strain Building and perform an inspection. On or about January 19, 2023, personnel with Ace Roofing, LLC went to the Strain Building and attempted to patch and repair damage to the roof caused by Defendant and its agents/contractors. Ace Roofing, LLC cut open several portions of the EPDM membrane, which they never informed Plaintiffs about until after it had been done. Ace Roofing, LLC provided reports to Defendant's agent/contractor dated February 1 and 2, 2023, but these reports were not disclosed to Plaintiffs. Plaintiffs only obtained Ace Roofing, LLC's February 2, 2023, report from Defendant in response to Jason's formal written discovery in this case. When Defendant produced Ace Roofing, LLC's February 2, 2023, report, Defendant marked the report as "CONFIDENTIAL SUBJECT TO A PROTECTIVE ORDER" even though it is addressed to Defendant's agent/contractor and is not subject to any legitimate claim of privilege or protection. Defendant also withheld Ace Roofing, LLC's February 2, 2023, report until after Plaintiffs' had served their Expert Witness Disclosure at 5:00 p.m. on June 2, 2025, even though Jason had requested this information in discovery requests served on March 14, 2025. Plaintiffs finally

received a copy of Ace Roofing, LLC's February 2, 2023, report from Defendant at 10:44 p.m. on June 2, 2025.

37. After receiving the report from Ace Roofing, LLC, Defendant's agent/contractor began demanding Ace Roofing, LLC make at least eighteen (18) additional statements to blame Plaintiffs for the damages present on the roof of the Strain Building and that were caused by Defendant and its agents/contractors. In response to these demands, Ace Roofing, LLC stated several of the requests were "tough to put in writing as I cannot provide this other than experience." These email communications were only obtained by Plaintiffs in response to a subpoena duces tecum Plaintiffs served on Ace Roofing, LLC and were not produced in discovery by Defendant. Ace Roofing, LLC also informed Defendant's agent/contractor that it would cost $576,000 to $634,000 to replace the roof at the Strain Building, which was only a preliminary estimate and subject to contingencies. Ace Roofing, LLC later increased its estimate to $633,000 to $700,000, subject to contingencies.

38. Defendant and its agents/contractors then sought out another roofer to inspect the Strain Building and hired Tom Bradford with Bradford Roof Management, Inc. Bradford inspected the roof at the Strain Building on April 6, 2023, and prepared a report dated April 18, 2023, for Defendant and its agents/contractors. In his report, Bradford admitted "[n]o doubt there is damage

that should be addressed (small holes, small cuts, poor patching protocol)" as a result of foot traffic, loading, and unloading by Defendant and its agents/contractors on the Strain Building's roof. Bradford, however, stated the "shrunken membrane" on the roof had "more responsibility" for the damaged substrate and leaks in the roof at the Strain Building. Defendant's agent/contractor told Bradford "good job" upon receiving Bradford's report. Bradford also provided Defendant and its agents/contractors with an estimate to replace the roof at the Strain Building, which Bradford as admitted was a "budget price." Bradford was informed by Defendant's agent/contractor to "put in your quote you are not interested in the work." Upon information and belief, Defendant's agent/contractor has utilized the services of Bradford multiple times before and after his inspection of the Strain Building. Bradford's April 18, 2023, report and estimate were never disclosed or provided to Plaintiffs and were only obtained in response to formal written discovery in this case. When Defendant produced Bradford's April 18, 2023, report, Defendant marked the report as "CONFIDENTIAL SUBJECT TO A PROTECTIVE ORDER" even though it is addressed to Defendant's agent/contractor and is not subject to any legitimate claim of privilege or protection. Defendant also withheld Bradford's April 18, 2023, report until after Plaintiffs had served their Expert Witness Disclosure at 5:00 p.m. on June 2, 2025, even though Jason had requested this

information in discovery requests served on March 14, 2025. Third-Party Defendant Legacy Telecommunications LLC included a copy of Bradford's April 18, 2023, report with its Expert Witness Disclosure that it served on June 2, 2025, and did not mark, state, or indicate in any way that it was confidential or subject to any privilege or protection. Plaintiffs finally received a copy of Bradford's April 18, 2023, report from Defendant at 10:44 p.m. on June 2, 2025.

39. After receiving reports and estimates from Ace Roofing, LLC and Bradford, Defendant and its agents/contractors concealed these reports from Plaintiffs and continued to falsely represent to Plaintiffs that they were coordinating the needed roof repairs and that they would be performed. Defendant knew its representations to Plaintiffs that repairs to the roof would be performed were false and Defendant never had any intention of performing any roof repairs at the Strain Building at the time Defendant made these false representations to Plaintiffs. Defendant's false representations were not mere opinions or puffery, but knowingly false material statements. These knowingly false misrepresentations by Defendant were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, allow Defendant to gain an unfair advantage over Plaintiffs, and induce Plaintiffs to allow Defendant and its agents/contractors to finish installing Defendant's cellular equipment at the Strain Building.

40. The damage to the roof on the building caused by Defendant and its agents/contractors resulted in many leaks inside the building and significant damage. These damages have impacted not only Jason and Tammy, but tenants located in the building, including several who have occupied the building for many years. Jason and Tammy have spent hundreds of hours and incurred hundreds of thousands of dollars attempting to repair and mitigate the damages caused by Defendant and its agents/contractors. Plaintiffs' mitigation efforts remain continuing and ongoing. Jason has missed important family holidays and birthdays attempting to mitigate the damages caused by Defendant and its agents/contractor. To see such a historic building be destroyed from the outside in as a result of the damage caused by Defendant and its agents/contractors, has been very stressful and distressing for Jason, Tammy, and the entire Madill family. The relentless pressure to make repairs and come up with resources to mitigate the damages caused by Defendant and its agents/contractors has caused a profound sense of hopelessness, worry, and despair for Jason, Tammy, and the Madill family. The resulting mental anguish and suffering has taken a serious toll on Jason, Tammy, and the Madill family leaving them feeling drained and defeated.

41. The entire membrane, substrate, and supporting structure for the roof on the building now needs to be replaced entirely due to the damage caused by

Defendant and its agents/contractors. Doing so will require permitting, take many months, cause significant disruption to Plaintiffs and tenants who occupy the building, and cost at least $750,000.00. This work, as well as additional repairs, are needed in order to restore the building to the condition it was in before the damages caused by Defendant and its agents/contractors occurred.

42. After Defendant and its agents/contractors finished installing Defendant's cellular equipment at the Strain Building, they placed warning signs in the entry area to the roof stating "[t]ransmitting antennas may cause radio frequency fields beyond this point that may exceed the FCC general public exposure limit. Obey all posted signs and site guidelines for working in radio frequency environments." Defendant and its agents/contractors also posted a warning notice which states:

> -All personnel should have electromagnetic energy (EME) awareness training.
>
> -Obey all posted signs.
>
> -Assume all antennas are active.
>
> -Before working on antennas, notify owners and disable appropriate transmitters.
>
> -Maintain minimum 3 feet of clearance from all antennas.

-Do not stop in front of antennas.

-Use personal RF monitors while working near antennas.

-Never operate transmitters without shields during normal operation.

-Do not operate base station antennas in equipment room.

43. Defendant and its agents/contractors have posted additional warning signs regarding the radiation being emitted from Defendant's cellular equipment at the Strain Building. Upon information and belief, Defendant was required by the Federal Communications Commission to make sure Plaintiffs were "fully aware" of the risk of radiation exposure posed by Defendant's cellular equipment before it was installed. At no time prior to entering the Site Lease Agreement or when Defendant and its agents/contractors were installing Defendant's cellular equipment at the property were Plaintiffs informed of the above cited warnings or that Plaintiffs' access to the roof of their building would be restricted and require special precautions. Based upon Defendant's warning signage and radiation being emitted by Defendant's cellular equipment at the Strain Building, and without prior notice or agreement, Plaintiffs are now restricted from open and free usage of the entire rooftop on which the cellular tower sits, and Defendant is occupying and restricting usage of an area which far exceeds the leased space. Defendant has leased 190 square feet of space at the Strain Building but is using and has occupied and

restricted Plaintiffs from using 11,250 square feet. Based on the rate agreed to by the parties in the Site Lease Agreement, Defendant is liable to Plaintiffs in the amount of $88,816 per month.

44. After Defendant placed its warning signs regarding the radiation being emitted from Defendant's cellular equipment at the Strain Building, Jason asked Defendant's project manager about the signs and danger posed by Defendant's cellular equipment. Defendant's project manager told Jason that if he was on the roof and tasted copper in his mouth, that meant he was getting too much radiation from Defendant's cellular equipment and needed to "get out of it" because "it's cooking you from the inside." The resulting conditions created by installation of Defendant's cellular equipment at the Strain Building are appropriately characterized as abnormally, unreasonably, and inherently dangerous.

45. During formal written discovery in this lawsuit, Plaintiffs asked Defendant to provide information and documentation regarding the radiation being emitted by its cellular equipment at the Strain Building. Defendant has refused to do so and is still withholding all information and documentation related to the radiation Defendant is causing at the Strain Building from Plaintiffs. On July 30, 2025, Defendant served a "Rebuttal Expert Witness Disclosure" which included a report from William F. Hammett. In his report, Hammett states Defendant "has

provided a report, prepared by Global Telecommunications Associates ("GTA"), that shows the exposure levels on the main roof of the [Strain Building], as measured on May 24, 2023[.]" Defendant has never provided Plaintiffs with the report Hammett states was provided to him by Defendant and has never provided Plaintiffs with any measurements of the radiation exposure levels caused by Defendant's equipment at the Strain Building. Plaintiffs specifically requested these materials from Defendant in discovery, but Defendant refused to produce them and never identified Global Telecommunications Associates ("GTA") in its Initial Disclosure or answers and responses to Plaintiffs' written discovery.

46. Defendant retained and disclosed Scott R. Smith as an expert witness in this case. Smith performed an inspection at the Strain Building on May 22, 2025. Smith's protocol for the inspection states:

> This inspection may include areas in proximity to RF-emitting equipment (e.g., antennas or base station components) associated with the T-Mobile cell tower installation.
>
> At the time of this inspection protocol's issuance, no RF safety procedures, power-down confirmations, or exposure guidelines have been provided by T-Mobile or the property owner.
>
> It is the responsibility of T-Mobile to provide all applicable RF safety documentation, power status disclosures, and required precautions in advance of site access. If RF hazard signage, barriers, or live emissions are observed on site, the inspection team reserves the right to defer or restrict access to affected areas until written confirmation of safety is received.

> All personnel will follow OSHA and FCC guidelines regarding maximum permissible exposure (MPE) limits and will carry RF monitors if deemed necessary based on final documentation received.

47. Defendant has never provided Plaintiffs with any of the information Smith required prior to his inspection of the Strain Building for Defendant. Defendant has never provided Plaintiffs with any RF safety procedures, power-down confirmations, or exposure guidelines. Defendant has never provided Plaintiffs with all applicable RF safety documentation, power status disclosures, and required precautions. Defendant has never provided Plaintiffs with OSHA and FCC guidelines regarding maximum permissible exposure (MPE) limits and RF monitors. Defendant even refuses to provide this information to Plaintiffs in response to formal discovery requests served in this litigation.

48. Plaintiffs have extensive photographic, video, and documentary evidence of the significant damages they have incurred and were caused by the tortious acts and omissions of Defendants and its agents/contractors and all of this information was provided to Defendant, almost two (2) full years ago. After Plaintiffs provided this information to Defendant, Plaintiffs were notified on January 11, 2024, that Defendant had "tendered" Plaintiffs' claims "to the contractor." At that point it became clear Defendant would blame its own agents/contractors for Plaintiffs damages and Plaintiffs were left with no other choice than to file suit.

49. Plaintiffs retained Rodney Blake (PE) with TD&H Engineering in Great Falls, Montana to inspect the Strain Building and offer opinions about the damages caused by Defendant and its agents/contractors. Mr. Blake is a structural engineer licensed in the states of Montana, North Dakota, Wyoming, Vermont and Idaho. He is also licensed in several Canadian provinces. Mr. Blake has structural engineering experience with all structures including bridges, roofs, foundations, buildings, etc. and is the Structural Department Manager at TD&H Engineering in Great Falls, Montana. In his report dated September 25, 2024, which has been provided to Defendant, Mr. Blake states:

> Based on our observations, it is more likely than not that much of the damage seen on the roof is consistent with high-traffic construction activities. The gypsum underlayment under the south and east portions of the roof is severely damaged and is unable to provide a smooth finish for the membrane roof. This increases the risk of puncture wounds to the membrane, as the edges of the crushed gypsum can be sharp and pointing in various directions. Without a flat substrate, the useful life of the membrane can be significantly reduced. Additionally, the uneven substrate allows for ponding to occur, as there are mounds of gypsum blocking the path for water to reach the drain in some locations. From our sampling efforts, the only location observed that is in good condition is the northwest corner, where the workers were unable to easily use the space, as window-washing equipment was stored there.
>
> It is our belief that the damage observed occurred due to careless construction practices. The locations where multiple pieces of heavy equipment were rolled across the membrane with a dolly and no walking pads or supports has substantial damage that cannot be remedied unless the roof and substrate are removed and replaced. Additionally, when lacerations were made in the membrane and left unrepaired during moisture events, the gypsum underlayment was weakened due to exposure to this moisture. The membrane

does not allow this moisture to dry out easily, leading to increased risk of mold forming due to dark and wet conditions.

Had these construction activities not occurred, the roof likely would be in a similar condition to that in the northwest corner. While there is no way to determine exactly how long the membrane would have lasted without these damages, the good condition of the membrane and substrate in the northwest corner indicates the roof likely would have lasted at least another 10 years, but with additional maintenance could have lasted much longer.

Due to the substantial damage to the underlayment of the roof, it is unlikely that adding more patches will remedy the issue at hand. The only long-term remedy in this situation would be to reroof the building with a new durable recovery board (Densdeck or IsoBoard) and membrane. We strongly recommend replacing the roof as soon as possible, as continued exposure to moisture may lead to damage to the building materials below the roof and in other substrate materials. We expect the cost to replace the roof underlayment and membrane (EPDM) to be around $750,000. This cost estimate includes but is not limited to; the cost associated with permits, engineering project management, construction labor, demolition and disposal, new materials, portable potties, perimeter fall protection, and contingency.

We recognize that many of the reputable roofing companies in and around Great Falls are booked for years out, and it may be difficult to do this right away. If it is not possible to get the roof replaced right away, the following steps should be taken to prevent as much moisture from infiltrating the roof as possible:

1. In the areas where the membrane is being stretched and pulled away from the walls, cut the membrane and lay it flat on the roof. Add another panel of fully adhered ethylene propylene diene monomer (EPDM) to the wall and edge of the roof, ensuring that there is sufficient lap splice per manufacturer recommendations. The existing termination bar may need to be replaced, but if it is in good condition, it may be able to be reused for this short-term solution. The cost to perform this temporary repair is likely around $70,000.

> 2. Inspect the roof at frequent intervals to check for damage. Add patches during these inspections and deemed necessary to prevent moisture infiltration. After moisture events, any standing water on the roof should be manually pushed toward the drain. The cost for these continued repairs varies, but likely would not exceed $40,000.

50. The tortious acts and omissions of Defendant and its agents/contractors have caused Plaintiffs to suffer significant damages, which are ongoing and will be proven at trial. The tortious acts and omissions of Defendant and its agents/contractors show deliberate indifference and intentional disregard of causing injury and damage to Plaintiffs. Defendant and its agents/contractors have also made multiple representations with knowledge of their falsity and have concealed materials facts for the purpose of depriving Plaintiffs of property, their legal rights, and causing injury and damage to Plaintiffs. Defendant is vicariously liable for the tortious conduct of its agents/contractors.

51. Plaintiffs did not cause or contribute in any manner whatsoever to the damages sought in this lawsuit and have done everything reasonably possible to mitigate their damages caused by the tortious conduct of Defendant and its agents/contractors.

52. Plaintiffs have not waived any claims against Defendant.

53. All of Plaintiffs allegations and claims set forth herein are timely filed and not barred by any statute of limitations.

54. Plaintiffs have not settled with and/or released any person or entity from liability for the damages alleged herein.

55. Plaintiffs alleged damages were not the direct and proximate result of any superseding and/or intervening causes.

56. Plaintiffs have not received any payments, benefits, and/or settlements from any collateral sources for the damages alleged herein.

57. Exhibit B to the Site Lease Agreement incorporated the construction drawings and/or site plan identified as "Great Falls The Strain Building" and by site number "MT02267D." This site plan was developed and approved by Defendant. Within the construction drawings/site plan adopted and approved by Defendant, the General Notes, on page G-1, indicate, in part, as follows:

> 11. CONTRACTOR SHALL MAKE NECESSARY PROVISIONS TO PROTECT EXISTING IMPROVEMENTS, EASEMENTS, CURBING, ETC. DURING CONSTRUCTION. UPON COMPLETION OF THE WORK, CONTRACTOR SHALL REPAIR ANY DAMAGE THAT MAY HAVE OCCURRED DUE TO CONSTRUCTION ON OR ABOUT THE PROPERTY.
>
> 12. CONTRACTOR SHALL KEEP GENERAL WORK AREA CLEAN AND HAZARD FREE DURING CONSTRUCTION AND DISPOSE OF ALL DIRT, DEBRIS, AND RUBBISH OFF SITE. CONTRACTOR SHALL REMOVE EQUIPMENT NOT SPECIFIED AS REMAINING ON THE PROPERTY OR PREMISES. SITE SHALL BE LEFT IN CLEAN CONDITION AND FREE FROM PAINT SPOTS, DUST OR SMUDGES OF ANY NATURE.

***

22. IN THE CASE OF ROOFTOP SOLUTIONS FOR EQUIPEMENT AND/OR ANTENNAE FRAMES WHERE PENETRATION OF EXISTING ROOFING MATERIALS OCCUR, THE GENERAL CONTRACTOR SHALL COORDINATE WITH BUILDING OWNER AND BUILDING ROOFING CONTRACTOR OF RECORD FOR INSTALLATION, PATCH, REPAIR OR ANY AUGMENTATION TO THE ROOF, AND HAVE THE WORK GUARANTEED UNDER THE ROOFING CONTRACTOR'S WARRANTY FOR MOISTURE PENETRATION OR OTHER FUTURE BREACH OF ROOF INTEGRITY.

58. Paragraph No. 21(a) of the Site Lease Agreement provides the prevailing party in any litigation arising under the Site Lease Agreement shall be entitled to reimbursement from the non-prevailing party for reasonable attorneys' fees and expenses. Pursuant to this provision and because Defendant has breached the Site Lease Agreement, Plaintiffs are entitled to recovery of their reasonable attorneys' fees, costs, and expenses incurred to date and which are ongoing.

**COUNT 1 - NEGLIGENCE**

59. Plaintiffs reallege and incorporate paragraphs 1 – 58 as if set forth herein.

60. Defendant owed Plaintiffs a duty of care with respect to the work Defendant and its agents/contractors performed at the Strain Building.

61. Defendant owed Plaintiffs duties to perform its work at the Strain Building in a reasonably skillful and workmanlike manner and to ensure any

agents/contractors retained by Defendant performed their work in a reasonably skillful and workmanlike manner.

62. Defendant owed Plaintiffs duties to perform and supervise work at the Strain Building, to complete the work at the Strain Building in a skillful and workmanlike manner, in compliance with all applicable statutes, rules, regulations, and industry standards so as to avoid creating conditions that would foreseeably harm Plaintiffs.

63. Defendant owed Plaintiffs duties to act reasonably in the selection, hiring and supervision of agents/contractors Defendant had perform work at the Strain Building.

64. Defendant breached its duties owed to Plaintiffs.

65. Defendant's breach of its duties caused significant damage to the Strain Building and Plaintiffs.

66. Plaintiffs have suffered damages as a result of Defendant's negligence in an amount to be proven at trial.

## COUNT 2 – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

67. Plaintiffs reallege and incorporate paragraphs 1 – 66 as if set forth herein.

68. In Montana, every contract contains an implied covenant of good faith and fair dealing. A breach of the covenant is a breach of the contract.

69. “Good faith and fair dealing” is defined in Mont. Code Ann. § 28-1-211 as “honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.”

70. The acts and/or omissions of Defendant and its agents/contractors described above breached the implied covenant of good faith and fair dealing in the Site Lease Agreement.

71. Plaintiffs have suffered damages as a result of Defendant’s breach of the implied covenant of good faith and fair dealing in an amount to be proven at trial.

**COUNT 3 – DECEIT**

72. Plaintiffs reallege and incorporate paragraphs 1 – 71 as if set forth herein.

73. Montana recognizes the tort of deceit. Mont. Code Ann. § 27-1-712 defines deceit as follows:

> One who willfully deceives another with intent to induce that person to alter the person’s position to the person’s injury or risk is liable for any damage that the person suffers.
>
> (2) A deceit, within the meaning of subsection (1), is either:
>
> (a) the suggestion as a fact of that which is not true by one who does not believe it to be true;

(b) the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(c) the suppression of a fact by one who is bound to disclose it or who gives information of other facts that are likely to mislead for want of communication of that fact; or

(d) a promise made without any intention of performing it.

74. Defendant and its agents/contractors made multiple suggestions and assertions of fact which were not true, that Defendant and its agents/contractors knew were not true, and that Defendant and its agents/contractors had no reasonable ground for believing to be true. Defendant and its agents/contractors suppressed facts they were bound to disclose to Plaintiffs and that mislead Plaintiffs by failing to communicate those facts. Defendant and its agents/contractors also made multiple promises to Plaintiffs without any intention of performing them.

75. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the worked it needed to perform at the Strain Building would be extensive, impactful and damaging to the roof at the Strain Building. Despite this knowledge, Defendant suppressed and concealed the true scope of the work it intended to perform at the Strain Building from Plaintiffs. Defendant also falsely represented to Plaintiffs that the work would be quick, timely, non-invasive, and performed in a quality and workmanlike manner, in order to gain an advantage over

Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing promises and representations were not "merely puffing" or statements of opinion, but knowingly false statements and promises used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

76. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would have equipment and workers on the roof of the Strain Building and would not use protective matting to protect the roof from damage, even though Defendant promised Plaintiffs that protective matting would be utilized to protect the roof at the Strain Building from damage. Despite this knowledge, Defendant suppressed and concealed these facts from Plaintiffs. Defendant also falsely represented to Plaintiffs that protective matting would be utilized to protect the roof on the Strain Building, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing promises and representations were not "merely puffing" or statements of opinion, but knowingly false statements and promises used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

77. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would not provide a sufficient crew of skilled workers to complete installation of Defendant's equipment in a careful and skillful manner. Upon information and belief, Defendant had been sued multiple times for substandard work during rooftop cellular installations prior to execution of the Site Lease Agreement with Plaintiffs and Defendant knew that its agents/contractors were damaging and destroying private property during rooftop installations of Defendant's cellular equipment. Defendant's own engineer, Mark Olson, acknowledged that property owners have "many times correctly" blamed Defendant for damaging and destroying the roof on property during rooftop cellular installations. Despite this knowledge, Defendant falsely promised and represented to Plaintiffs that all work its agents/contractors performed at the Strain Building would be done in a skillful and workmanlike manner, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing promises and representations were not "merely puffing" or statements of opinion, but knowingly false statements and promises used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

78. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the cellular equipment it planned to install at the Strain Building would emit radiofrequency radiation that required warnings and special precautions. On its Form 10-K filed with the United States Securities and Exchange Commission, dated February 6, 2020, Defendant reported it was aware of allegations and lawsuits that the equipment on its cellular towers was linked to various health concerns, including cancer and brain tumors. Upon information and belief, Defendant had been involved in litigation related to radiation emitted from its cellular equipment prior to execution of the Site Lease Agreement. Defendant knew that the radiation emitted by its equipment required warnings and special precautions before Plaintiffs were ever contacted by Defendant's agent, Craig and Associates (d/b/a CAA Wireless). Despite this knowledge, Defendant falsely promised and represented to Plaintiffs that none of its equipment installed at the Strain Building would emit radiation or require warnings and special precautions, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing promises and representations were not "merely puffing" or statements of opinion, but knowingly false statements and promises used by Defendant to create false impressions, deceive and mislead

Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

79. Paragraph No. 10 of the Site Lease Agreement states that if the building or adjacent building areas are damaged or destroyed by Defendant or its contractors or representatives during the construction of the antenna facilities, Defendant shall be required to coordinate and pay for any applicable repairs. Defendant never had any intention of complying with this contractual provision and knew that if any damage was caused to the Strain Building during the installation of its cellular equipment, it would blame its agents/contractors and Plaintiffs. At the time Defendant's Market Manager Brian Tucci signed the lease on behalf of Defendant on April 12, 2021, Defendant knew it had no intention of ever complying with the provisions contained in Paragraph No. 10 of the Site Lease Agreement and instead concealed its intentions and falsely represented to Plaintiffs that Defendant would in fact do so. Defendant's false representations and concealment of its true intentions with respect to the obligations contained in Paragraph No. 10 of the Site Lease Agreement were not mere opinions or puffery, but knowingly false material misrepresentations and promises. These knowingly false misrepresentations and promises by Defendant were intentional and used by Defendant to create false

impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

80. After Plaintiffs reported deficiencies and damage being caused by the work of Defendant's agents/contractors at the Strain Building, Defendant misrepresented the seriousness of the problems and falsely assured and promised Plaintiffs that Defendant would hire a competent roofer to repair the damages and fix any other problems. Defendant knew it never intended to perform any repairs of the damage caused by Defendant and its agents/contractors at the Strain Building and that it would instead blame others and tie Plaintiffs up in litigation for years. Once Plaintiffs retained counsel and filed suit, Defendant blamed its agents/contractors for Plaintiffs' damages and has threatened Plaintiffs that they will have to pay Defendant's attorney fees and costs associated with this litigation. Defendant's foregoing promises and representations were not "merely puffing" or statements of opinion, but knowingly false statements and promises used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

81. It is clear, Defendant's only interest was to get its cellular equipment installed as quickly as possible so it could be activated to expand Defendant's

cellular network and increase profits, without any regard for Plaintiffs and the damages they have suffered. Defendant and its agents/contractors knew that if they had been honest with Plaintiffs before the Site Lease Agreement was ever signed and after Plaintiffs reported damages that were being caused by the work, Plaintiffs never would have agreed to allow Defendant T-Mobile to install its cellular equipment at the Strain Building. Plaintiffs have now been forced into a lawsuit against a major corporation and threatened by Defendant that they will have to pay Defendant's attorney fees.

82. As alleged herein, Defendant and its agents/contractors willfully deceived Plaintiffs with the intent to induce Plaintiffs to alter their position to Plaintiffs' detriment resulting in injury and damage.

83. As alleged herein, Defendant and its agents/contractors made assertions of fact to Plaintiffs when they have no reasonable ground for believing those assertions to be true.

84. As alleged herein, Defendant and its agents/contractors suppressed facts from Plaintiffs although they were bound to disclose the truth of these issues to Plaintiff.

85. Plaintiffs have suffered damages as a result of Defendant's deceit.

## COUNT 4 – CONSTRUCTIVE FRAUD

86. Plaintiffs reallege and incorporate paragraphs 1 – 85 as if set forth herein.

87. Montana recognizes the tort of constructive fraud. Mont. Code Ann. § 28-2-408 states constructive fraud consists of:

> (1) any breach of duty that, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under the person in fault by misleading another person to that person's prejudice or to the prejudice of anyone claiming under that person; or
>
> (2) any act or omission that the law especially declares to be fraudulent, without respect to actual fraud.

88. In *White v. Longley*, 2010 MT 254, 358 Mont. 268, 244 P.3d 753, the Montana Supreme Court addressed a claim for constructive fraud during a construction project. In that case, the plaintiffs (Steve and Donna White) hired the defendant (Tom Longley) to build them a home. The Montana Supreme Court affirmed the district court's finding the defendant had committed the tort of constructive fraud, holding:

> Longley and Castle Homes argue on appeal that there was insufficient evidence of constructive fraud. They argue that if the Whites were misled it was due to their "own factual misunderstanding" and their failure to disclose everything that they assumed from their dealings with him. Further, Longley and Castle Homes remarkably assert in briefing on appeal that "[a]t no time did Longley practice, offer to practice, or attempt to practice professional engineering in the design or construction of the Whites' home." Longley's

representations to the Whites were, according to Longley and Castle Homes, merely puffing.

Longley and Castle Homes present no support for their contention that a party being defrauded has the obligation to inform the defrauder that he is being defrauded. The District Court's detailed findings describing the deficiencies in the house and the conclusion that it was not salvageable support the truth of Longley's contention on appeal that he never practiced professional engineering in the design or construction of the Whites' house.

The District Court made express findings of fact that support the conclusion that Longley engaged in constructive fraud. His written materials featured the fact that he had "Ph.D., P.E." credentials. He told the Whites that he could build the home they envisioned with the budget they had to spend. He answered the Whites' inquiry about hiring an architect by telling them that he could complete the design of the house. He promoted his "castle wall" concept of exterior wall insulation that would make the home energy efficient. His written materials contained glowing endorsements that he represented to be from satisfied customers. He furnished supposed construction drawings for the house which were wholly inadequate to guide the construction of the project. He represented that he would provide a sufficient crew of skilled workers to build the house. He failed to disclose to the Whites the inadequacy of his preparation for the project, the inferior materials being used, and the inferior workmanship. He cajoled the Whites into the "buyout" of the written contract, which did not benefit the Whites and cost them an additional $ 30,000 that went to Longley and Castle Homes. He threatened the Whites with expensive and protracted arbitration, and represented that he had talked to the arbitrator and that the Whites would lose.

Longley failed to disclose to the Whites that the structure was inadequate to support the roof, that the roof was not properly engineered, and that the materials he bought for the roof were inadequate. After deficiencies surfaced, Longley assured the Whites that he would put a "super crew" on the project and repair any problems. He listed Steve White as the "registered agent" for Castle Homes, LLC, in filings with the State of Montana, without Steve White's consent and without Steve White's knowledge. He threatened the Whites with expensive and protracted arbitration proceedings, even after taking $ 30,000 from them to terminate the contract that provided for

arbitration. When he needed to do so, Longley blamed others for the problems with the project, including Larson Lumber, Boise Cascade, and the Whites themselves. As the District Court found, Longley "misrepresented his ability to assist in the design of the Whites' home and to provide a skilled crew to construct the home according to applicable industry standards. When problems were pointed out to Longley, he misrepresented the seriousness of the problems and his ability to fix them."

***

It is clear from the facts that Longley knowingly made any number of material representations about the Whites' house project that induced them to trust him and to invest substantial sums of money with him. Longley knew exactly what was going on. He knew the limits of his own qualifications and abilities. He knew the deficiencies in the project because they were obvious to any experienced contractor and because his crew foreman Ellis told him. There is abundant evidence to support the District Court's findings and conclusions regarding constructive fraud.

*Id.*, ¶¶ 24-29.

89. As the Montana Supreme Court determined in *White,* the facts alleged by Plaintiff are sufficient to establish a claim for constructive fraud against Defendant under Montana law.

90. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the worked it needed to perform at the Strain Building would be extensive, impactful and damaging to the roof at the Strain Building. Despite this knowledge, Defendant falsely represented to Plaintiffs that the work would be quick, timely, non-invasive, and performed in a quality and workmanlike manner, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease

agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

91. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would have equipment and workers on the roof of the Strain Building and would not use protective matting to protect the roof from damage. Despite this knowledge, Defendant falsely represented to Plaintiffs that no workers and equipment would be on the roof and that protective matting would be utilized to protect the roof on the Strain Building if Defendant and its agents/contractors unexpectedly did have workers or equipment on the roof, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

92. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would not provide a sufficient crew of skilled workers to

complete installation of Defendant's equipment in a careful and skillful manner. Upon information and belief, Defendant had been sued multiple times for substandard work during rooftop cellular installations prior to execution of the Site Lease Agreement with Plaintiffs and Defendant knew that its agents/contractors were damaging and destroying private property during rooftop installations of Defendant's cellular equipment. Defendant's own engineer, Mark Olson, acknowledged that property owners have "many times correctly" blamed Defendant for damaging and destroying the roof on property during rooftop cellular installations. Despite this knowledge, Defendant falsely represented to Plaintiffs that all work its agents/contractors performed at the Strain Building would be done in a skillful and workmanlike manner, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

93. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the cellular equipment it planned to install at the Strain Building would emit radiofrequency radiation that required warnings and special

precautions. On its Form 10-K filed with the United States Securities and Exchange Commission, dated February 6, 2020, Defendant reported it was aware of allegations and lawsuits that the equipment on its cellular towers was linked to various health concerns, including cancer and brain tumors. Upon information and belief, Defendant had been involved in litigation related to radiation emitted from its cellular equipment prior to execution of the Site Lease Agreement. Defendant knew that the radiation emitted by its equipment required warnings and special precautions before Plaintiffs were ever contacted by Defendant's agent, Craig and Associates (d/b/a CAA Wireless). Despite this knowledge, Defendant falsely represented to Plaintiffs that none of its equipment installed at the Strain Building would emit radiation or require warnings and special precautions, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

94. Paragraph No. 10 of the Site Lease Agreement states that if the building or adjacent building areas are damaged or destroyed by Defendant or its contractors or representatives during the construction of the antenna facilities, Defendant shall

be required to coordinate and pay for any applicable repairs. Defendant never had any intention of complying with this contractual provision and knew that if any damage was caused to the Strain Building during the installation of its cellular equipment, it would blame its agents/contractors and Plaintiffs. At the time Defendant's Market Manager Brian Tucci signed the lease on behalf of Defendant on April 12, 2021, Defendant knew it had no intention of ever complying with the provisions contained in Paragraph No. 10 of the Site Lease Agreement and instead concealed its intentions and falsely represented to Plaintiffs that Defendant would in fact do so. Defendant's false representations and concealment of its true intentions with respect to the obligations contained in Paragraph No. 10 of the Site Lease Agreement were not mere opinions or puffery, but knowingly false material misrepresentations and promises. These knowingly false misrepresentations and promises by Defendant were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

95. After Plaintiffs reported deficiencies and damage being caused by the work of Defendant's agents/contractors at the Strain Building, Defendant misrepresented the seriousness of the problems and falsely assured Plaintiffs that Defendant would hire a competent roofer to repair the damages and fix any other

problems. Defendant knew it never intended to perform any repairs of the damage caused by Defendant and its agents/contractors at the Strain Building and that it would instead blame others and tie Plaintiffs up in litigation for years. Once Plaintiffs retained counsel and filed suit, Defendant blamed its agents/contractors for Plaintiffs' damages and has threatened Plaintiffs that they will have to pay Defendant's attorney fees and costs associated with this litigation. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

96. It is clear, Defendant's only interest was to get its cellular equipment installed as quickly as possible so it could be activated to expand Defendant's cellular network and increase profits, without any regard for Plaintiffs and the damages they have suffered. Defendant and its agents/contractors knew that if they had been honest with Plaintiffs before the Site Lease Agreement was ever signed and after Plaintiffs reported damages that were being caused by the work, Plaintiffs never would have agreed to allow Defendant T-Mobile to install its cellular equipment at the Strain Building. Plaintiffs have now been forced into a lawsuit

against a major corporation and threatened by Defendant that they will have to pay Defendant's attorney fees.

97. As alleged herein, Defendant and its agents/contractors, by words and conduct, created a false impression concerning the Site Lease Agreement and the work needed and that would be done at the property and other important matters, and failed to disclose the relevant facts prior to Plaintiffs' actions taken in reliance on the false impressions Defendant and its agents/contractors created.

98. As alleged herein, Defendant and its agents/contractors had a duty of honesty in fact and to refrain from words and conduct that created false impressions on important matters such as the timing, type, quality, and scope of work that Defendant and its agents/contractors would be performing at the property.

99. As alleged herein, Defendant and its agents/contractors breached their duties to Plaintiffs, gaining an advantage to themselves by misleading Plaintiffs to their prejudice.

100. As alleged herein, Defendant and its agents/contractors' misleading words and conduct were material in that they induced Plaintiffs to make material decisions and other commitments in reliance on the promises of Defendant and its agents/contractors.

101. As alleged herein, Defendant and its agents/contractors knew they were misrepresenting their intentions at the time their commitments were made.

102. As alleged herein, Plaintiffs were ignorant of the misleading natures of Defendant and its agents/contractors' words and conduct.

103. As alleged herein, Plaintiffs relied, and had a right to rely, on the truth of the words and conduct by Defendant and its agents/contractors.

104. As alleged herein, Plaintiffs have suffered damages caused by their reliance on the misrepresentations by Defendant and its agents/contractors in an amount to be proven at trial.

**COUNT 5 – NEGLIGENT MISREPRESENTATION**

105. Plaintiffs reallege and incorporate paragraphs 1 – 104 as if set forth herein.

106. Montana recognizes the tort of negligent misrepresentation. In *Morrow v. Bank of Am., N.A.*, 2014 MT 117, ⁋ 45, 375 Mont. 38, 324 P.3d 1167, the Montana Supreme Court set forth following elements for the tort of negligent misrepresentation:

a) the defendant made a representation as to a past or existing material fact;

b) the representation must have been untrue;

c) regardless of its actual belief, the defendant must have made the representations without any reasonable ground for believing it to be true;

d) the representation must have been made with the intent to induce the plaintiff to rely on it;

e) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation and it must have been justified in relying upon the representation;

f) the plaintiff, as a result of its reliance, must sustain damage.

107. As the Montana Supreme Court determined in *Morrow*, the facts alleged by Plaintiffs herein are sufficient to establish a claim for negligent misrepresentation against Defendant under Montana law.

108. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the work Defendant and its agents/contractors needed to perform at the Strain Building would be extensive, impactful and damaging to the roof at the Strain Building. Despite this knowledge, Defendant falsely represented to Plaintiffs that the work would be quick, timely, non-invasive, and performed in a quality and workmanlike manner, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

109. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would have workers and on the equipment on the roof of the Strain Building and that it would not use protective matting to protect the roof from damage. Despite this knowledge, Defendant falsely represented to Plaintiffs that no workers and equipment would need to be on the roof of the Strain Building but that if unexpectedly any workers or equipment did need to be on the roof, protective matting would be utilized to protect the roof on the Strain Building, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

110. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew it would not provide a sufficient crew of skilled workers to complete installation of Defendant's equipment in a careful and skillful manner. Upon information and belief, Defendant had been sued multiple times for substandard work during rooftop cellular installations prior to execution of the Site Lease Agreement with Plaintiffs and Defendant knew that its agents/contractors were damaging and destroying private property during rooftop installations of

Defendant's cellular equipment. Defendant's own engineer, Mark Olson, acknowledged that property owners have "many times correctly" blamed Defendant for damaging and destroying the roof on property during rooftop cellular installations. Despite this knowledge, Defendant falsely represented to Plaintiffs that all work its agents/contractors performed at the Strain Building would be done in a skillful and workmanlike manner, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

111. Prior to execution of the Site Lease Agreement on June 3, 2021, Defendant knew that the cellular equipment it planned to install at the Strain Building would emit radiofrequency radiation that required warnings and special precautions. On its Form 10-K filed with the United States Securities and Exchange Commission, dated February 6, 2020, Defendant reported it was aware of allegations and lawsuits that the equipment on its cellular towers was linked to various health concerns, including cancer and brain tumors. Upon information and belief, Defendant had been involved in litigation related to radiation emitted from its

cellular equipment prior to execution of the Site Lease Agreement. Defendant knew that the radiation emitted by its equipment required warnings and special precautions before Plaintiffs were ever contacted by Defendant's agent, Craig and Associates (d/b/a CAA Wireless). Despite this knowledge, Defendant falsely represented to Plaintiffs that none of its equipment installed at the Strain Building would emit radiation or require warnings and special precautions, in order to gain an advantage over Plaintiffs and induce Plaintiffs to enter into a lease agreement with Defendant. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

112. Paragraph No. 10 of the Site Lease Agreement states that if the building or adjacent building areas are damaged or destroyed by Defendant or its contractors or representatives during the construction of the antenna facilities, Defendant shall be required to coordinate and pay for any applicable repairs. Defendant never had any intention of complying with this contractual provision and knew that if any damage was caused to the Strain Building during the installation of its cellular equipment, it would blame its agents/contractors and Plaintiffs. At the time Defendant's Market Manager Brian Tucci signed the lease on behalf of Defendant

on April 12, 2021, Defendant knew it had no intention of ever complying with the provisions contained in Paragraph No. 10 of the Site Lease Agreement and instead concealed its intentions and falsely represented to Plaintiffs that Defendant would in fact do so. Defendant's false representations and concealment of its true intentions with respect to the obligations contained in Paragraph No. 10 of the Site Lease Agreement were not mere opinions or puffery, but knowingly false material misrepresentations. These knowingly false misrepresentations by Defendant were intentional and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

113. After Plaintiffs reported deficiencies and damage being caused by the work of Defendant's agents/contractors at the Strain Building, Defendant misrepresented the seriousness of the problems and falsely assured Plaintiffs that Defendant would hire a competent roofer to repair the damages and fix any other problems. Defendant knew it never intended to perform any repairs of the damage caused by Defendant and its agents/contractors at the Strain Building and that it would instead blame others and tie Plaintiffs up in litigation for years. Once Plaintiffs retained counsel and filed suit, Defendant blamed its agents/contractors for Plaintiffs' damages and has threatened Plaintiffs that they will have to pay

Defendant's attorney fees and costs associated with this litigation. Defendant's foregoing representations were not "merely puffing" or statements of opinion, but knowingly false statements and used by Defendant to create false impressions, deceive and mislead Plaintiffs, induce Plaintiffs into a lease agreement, and allow Defendant to gain an unfair advantage over Plaintiffs.

114. It is clear, Defendant's only interest was to get its cellular equipment installed as quickly as possible so it could be activated to expand Defendant's cellular network and increase profits, without any regard for Plaintiffs and the damages they have suffered. Defendant and its agents/contractors knew that if they had been honest with Plaintiffs before the Site Lease Agreement was ever signed and after Plaintiffs reported damages that were being caused by the work, Plaintiffs never would have agreed to allow Defendant T-Mobile to install its cellular equipment at the Strain Building. Plaintiffs have now been forced into a lawsuit against a major corporation and threatened by Defendant that they will have to pay Defendant's attorney fees.

115. As alleged herein, the false representations made by Defendant and its agents/contractors were made to induce Plaintiffs to act to their detriment.

116. As alleged herein, false representations made by Defendant and its agents/contractors were made through negligence and a lack of due care on the part of Defendant and its agents/contractors.

117. As alleged herein, Plaintiffs, in reliance on the false representations of Defendant and its agents/contractors, acted to their detriment.

118. Plaintiffs' reliance on the statements and representations of Defendant and its agents/contractors was reasonable.

119. As a result of the false representations of Defendant and its agents/contractors, Plaintiffs have suffered damages in an amount to be proven at trial.

## COUNT 6 – BREACH OF CONTRACT

120. Plaintiffs reallege and incorporate paragraphs 1 – 119 as if set forth herein.

121. Plaintiffs and Defendant entered into a written contract, titled Site Lease Agreement.

122. Defendant breached its contract with Plaintiffs by failing to coordinate and pay for the repairs and restoration needed as a result of damage caused by Defendant and its agents/contractors as the contract requires.

123. Defendant breached its contract with Plaintiffs regarding the leased space that would be necessary for its cellular tower and the restrictions and warnings which extend beyond the leased space which affect Plaintiffs' ability to use the affected non-leased space. Based upon Defendant's warning signage and radiation being emitted by Defendant's cellular equipment at the Strain Building, and without prior notice or agreement, Plaintiffs are now restricted from open and free usage of the entire rooftop on which the cellular tower sits, and Defendant is occupying and restricting usage of an area which far exceeds the leased space. Defendant has leased 190 square feet of space at the Strain Building but is using and has occupied and restricted Plaintiffs from using 11,250 square feet. Based on the rate agreed to by the parties in the Site Lease Agreement, Defendant is liable to Plaintiffs in the amount of $88,816 per month.

124. Defendant breached its contract with Plaintiffs by failing to take necessary provisions and precautions to protect the Strain Building during the construction and work by Defendant and its agents/contractors while installing Defendant's cellular equipment at the Strain Building.

125. Defendant breached its contract with Plaintiffs by failing to keep the general work area utilized by Defendant and its agents/contractors at the Strain

Building clean and hazard free and failing to leave the Strain Building in clean condition and free from damage.

126. Defendant's conduct violated both the express terms of its contract with Plaintiffs and terms, representations, covenants, and warranties implied in the contract by law.

127. Defendant has failed to cure its breaches of its contract with Plaintiffs after receiving written notice from Plaintiffs and Defendant has defaulted under the contract.

128. As a result of Defendant's breach of contract, Plaintiffs have suffered damages in an amount to be proven at trial.

WHEREFORE, Plaintiffs pray this Court:

1. Enter Judgment against Defendant T-Mobile West LLC for all damages, injuries, and losses to which Plaintiffs are entitled to under Montana law;

2. Grant Plaintiffs their attorney fees;

3. Grant Plaintiffs pre- and post-judgment interest;

4. Grant Plaintiffs costs and disbursements incurred herein; and,

5. For such other and further relief this Court deems just and proper.

DATED this 21st day of August, 2025.

DUBOIS MILLS, PLLC

By: ***/s/ Neal P. DuBois***

Neal P. DuBois
104 4th Street North, Ste. 200
P.O. Box 1348
Great Falls, Montana 59403

Jesse Myers
MurphyMyers PLLC
27 North 27th Street, Suite 21A
PO Box 1619
Billings, MT 59103
*Attorneys for Plaintiffs*

**JURY DEMAND**

Plaintiffs demand a trial by jury of all issues so triable in this action.

DATED this 21st day of August, 2025.

DUBOIS MILLS, PLLC

By: ***/s/ Neal P. DuBois***

Neal P. DuBois
104 4th Street North, Ste. 200
P.O. Box 1348
Great Falls, Montana 59403

Jesse Myers
MurphyMyers PLLC
27 North 27th Street, Suite 21A
PO Box 1619
Billings, MT 59103
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, hereby certify that on the 21st day of August, 2025, a true and correct copy of the foregoing was served on the following person by the following means:

| | | | |
|---|---|---|---|
| 1, 2, 3 | CM/ECF | ________ | Fax |
| ________ | Hand Delivery | ________ | E-Mail |
| ________ | Mail | ________ | Overnight Delivery Service |

1. **Clerk, US District Court**

2. **Attorneys for Defendant**

Jill M. Gerdrum
Hall & Evans, LLC
125 Bank Street, Suite 403
Missoula, MT 59802
Email: gerdrumj@hallevans.com

3. **Attorneys for Third-Party Defendant**

Katherine S. Huso
Ryan J. Gustafson
2812 1st Avenue North, Suite 225
Billings, MT 59103-1098
Email: khuso@MKHATTORNEYS.COM
rgustafson@MKHATTORNEYS.COM