IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

|  |  |
|---|---|
| JASON MADILL, TAMARA MADILL, and FOUR TEN CENTRAL LLC, <br><br> Plaintiffs, <br><br> vs. <br><br> T-MOBILE WEST LLC, DOES 1–4, and X, Y, Z COMPANIES, <br><br> Defendants/Third-Party Plaintiffs, <br><br> vs. <br><br> LEGACY TELECOMMUNICATIONS, LLC, <br><br> Third-Party Defendant. | CV 24-114-GF-SPW <br><br><br> ORDER ON DEFENDANT T-MOBILE WEST LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFFS' MOTION TO STRIKE |

Defendant T-Mobile West LLC ("T-Mobile") filed a Motion for Partial Summary Judgment (Doc. 115) on March 4, 2026. Plaintiffs responded and simultaneously filed a Motion to Strike Defendant's Preemption Affirmative Defense (Doc. 123). The Motions are fully briefed and ripe for the Court's review. (*See* Docs. 116, 124, 142, 149).

For the following reasons, T-Mobile's Motion for Partial Summary Judgment is granted in part and denied in part. Plaintiffs' Motion to Strike is denied.

1

## I.    Background

In 2017, Plaintiffs Jason and Tammy Madill purchased real property, colloquially known as the "Strain Building," in Great Falls, Montana. (Doc. 125 at 12; Doc. 142 at 4). At the time of the purchase, there was an inactive cellular tower located on an elevated platform on the roof. (Doc. 41 at 7). In July 2020, T-Mobile, through its agent, contacted Plaintiffs expressing its interest in using the existing cellular tower to operate a wireless facility. (*Id.*).

The parties entered into a Site Lease Agreement (the "Agreement") on June 3, 2021. (Doc. 125 at 2). The Agreement governed the leased area, defined as the roof's "Premises." (*Id.* at 2–3). Although the parties now dispute exactly how much space was leased (*id.* at 3), the Agreement defines the Premises as "the leased premises plus any additional portions of the [Strain Building] which [T-Mobile] may require for the use and operation of its facilities as generally described on Exhibit B." (Doc. 119-1 at 1). Exhibit B depicts various construction drawings illustrating the Premises and stipulates that "the specific number and type of equipment . . . [are] in no way limit[ed] [by T-Mobile's] ability to alter, replace, add to, expand, enhance, modify, supplement, replace, refurbish, relocate or upgrade any such equipment within the Premises." (*Id.* at 10–37). Notwithstanding this description, Plaintiffs argue that the Premises include only the 190-foot space where the cellular tower sits and the 150-foot loading dock. (Doc. 125 at 3, 20–23, 35–36).

The Agreement further governed T-Mobile's lease of "the Premises for its equipment, personal property, and improvements associated with [its] wireless communications business," also known as the "Antenna Facilities." (Doc. 119-1 at 1; Doc. 125 at 3). T-Mobile was permitted to "control, secure or restrict access to the Antenna Facilities." (Doc. 119-1 at 1; Doc. 125 at 4). As consideration for the lease, T-Mobile paid Plaintiffs $1,650 per month. (Doc. 119-1 at 2; Doc. 125 at 5).

T-Mobile's installation project to activate the cellular tower began after the parties signed the Agreement and continued into 2021. (Doc. 41 at 14). The project did not go as Plaintiffs expected, so Plaintiffs initiated this action on October 1, 2024, alleging that T-Mobile caused extensive damage to the roof and that the active wireless tower now sharply limits Plaintiffs' access to the roof. (Doc. 1-1). Plaintiffs initially alleged six causes of action under Montana state law: negligence, breach of the implied covenant of good faith and fair dealing, deceit, negligent misrepresentation, constructive fraud, and breach of contract. (*Id.*). The Court has since dismissed the deceit, negligent misrepresentation, and constructive fraud claims (Counts 3–5) with prejudice. (Docs. 31, 103).

With respect to the remaining claims and their relevance to the Motion now before the Court, Plaintiffs generally allege that T-Mobile failed to inform Plaintiffs that: (1) access to the roof would be restricted; (2) signs would be placed at the roof's entrance warning that "radio frequency fields . . . may exceed the [Federal

Communications Commission's] general public exposure limit"; (3) radiation would be emitted by the cellular equipment; or (4) the cellular equipment would be "abnormally, unreasonably, and inherently dangerous." (Doc. 41 at 25–26). For example, Plaintiffs allege that on one occasion, T-Mobile's project manager "told Jason that if he was on the roof and tasted copper in his mouth, that meant he was getting too much radiation from T-Mobile's cellular equipment and needed to 'get out of it' because 'it's cooking you from the inside.'"[1] (*Id.* at 26).

As to the breach of contract claim specifically, Plaintiffs assert that:

> [T-Mobile] breached its contract with Plaintiffs regarding the leased space that would be necessary for its cellular tower and the restrictions and warnings which extend beyond the leased space which affect Plaintiffs' ability to use the affected non-leased space. Based upon [T-Mobile's] warning signage and radiation being emitted by [T-Mobile's] cellular equipment at the Strain Building, and without prior notice or agreement, Plaintiffs are now restricted from open and free usage of the entire rooftop on which the cellular tower sits, and [T-Mobile] is occupying and restricting usage of an area which far exceeds the leased space. [T-Mobile] has leased 190 square feet of space at the Strain Building but is using and has occupied and restricted Plaintiffs from using 11,250 square feet. Based on the rate agreed to by the parties in the Site Lease Agreement, [T-Mobile] is liable to Plaintiffs in the amount of $88,816 per month.

(*Id.* at 60).

---

[1] Jason has since testified that T-Mobile's construction manager told him that the danger of T-Mobile's equipment would "damage[] . . . [his] body and . . . cause [him] infertility, but . . . it didn't matter anyway because . . . [he] was too old and . . . already had all [his] kids." (Doc. 125 at 31; Doc. 125-6 at 60).

Throughout discovery, Plaintiffs have repeatedly requested information related to radiofrequency ("RF") emissions, often referring to them as harmful. (*See, e.g.*, Doc. 34 at 23–26; Doc. 73 at 3–9; Doc. 89 at 27). They have requested information from T-Mobile regarding RF-safety documentation, power status disclosures, and Federal Communications Commission ("FCC") guidelines regarding maximum permissible exposure limits and RF monitors. (Doc. 41 at 27–28; *see* Doc. 34 at 23–26; Doc. 73 at 3–9; Doc. 89 at 27; Doc. 124 at 20–21). Plaintiffs assert that T-Mobile has never provided them with this information. (Doc. 41 at 26–28; Doc. 125 at 38–46).

Related to RF emissions, Plaintiffs have disclosed the anticipated witness testimony of Dr. Paul Héroux, a professor of toxicology and health effects of electromagnetism at McGill College in Montreal, Canada. (Doc. 119-2 at 4). Dr. Héroux is expected to testify about wireless emissions, radiation, and health risks associated with T-Mobile's wireless equipment. (*Id.* at 5). He is also expected to testify that "T-Mobile should have disclosed the wireless radiation and associated risks that would be present at Plaintiffs' property and surrounding area before entering into the [Agreement]." (*Id.*). According to Dr. Héroux, "[FCC] limits on radiation exposure are far from protective of the public." (*Id.* at 52). In his opinion, "T-Mobile['s] wireless systems expose[] people living within [1640 feet] of the

antennas to real health risks of various kinds, . . . which T-Mobile should have warned [Plaintiffs] about." (*Id.*).

## II.    Legal Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When making a summary judgment determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See id.* at 587.

## III.    Discussion

Based on Plaintiffs' theories of liability, T-Mobile maintains that Plaintiffs are, in effect, mounting a challenge to the FCC's rules and regulations. T-Mobile thus seeks judgment as a matter of law asserting that Plaintiffs' remaining claims— "[insofar] as [they] seek to impose liability based on allegations . . . [of] RF

6

emissions and RF-related safety"—are preempted by federal law and cannot be adjudicated in this Court. (Doc. 116 at 9, 11).

Among Plaintiffs' many opposing arguments, Plaintiffs assert that they "are *not* asking . . . a jury to find [that the] FCC's regulatory limits on radiation emissions are unsafe or should be different."[2] (Doc. 124 at 13–14 (emphasis added)). They insist on holding T-Mobile accountable for: (1) its "'want of ordinary care' in withholding and failing to disclose the radiation that would be emitted by its cellular equipment"; (2) its "dishonesty about the conditions its cellular equipment would create at the Strain Building"; and (3) its occupation of an area exceeding the leased Premises. (*Id.*). Plaintiffs contend that none of these allegations concern RF-emission levels or "usurp the FCC's role in regulating . . . emissions." (*Id.* at 13).

Although Plaintiffs are bound by their representations concerning the scope of their claims, the manner in which they have framed their briefing, discovery requests, and expert testimony has complicated the task of isolating their operative theories of liability and evaluating preemption. Against this backdrop, the Court cautiously reviews the parties' substantive arguments and concludes that Plaintiffs' Motion to Strike must be denied, and that T-Mobile's Motion for Partial Summary

---

[2] Three sentences later, however, they write: "A finding in Plaintiffs' favor on any of [their claims] *does* require the jury to determine whether the FCC's regulatory limitations on radiation emissions are unsafe or insufficient." (Doc. 124 at 14 (emphasis added)). Because this appears to be a drafting error, the Court concludes that Plaintiffs intended to argue that their claims do *not* require a jury determination of RF-emission levels or FCC limits.

Judgment must be granted to the extent Plaintiffs' claims would require the Court to evaluate RF-emission safety or compliance with FCC limits.

### A.    Preemption as an Affirmative Defense

Before addressing the application of preemption, the Court first determines that, contrary to Plaintiffs' position, T-Mobile did not waive preemption as a defense and is not precluded from asserting it.

T-Mobile asserts that under the Communications Act of 1934 (the "Communications Act"), preemption operates as "a substantive [limitation] of jurisdiction," for which courts lack power to adjudicate. (Doc. 142 at 4). Plaintiffs, however, contend that preemption is a waivable affirmative defense—one that T-Mobile waived and is now precluded from bringing for failing to disclose witness testimony or factual support. (Doc. 124 at 7–12).

The Communications Act created a dual federal-state regulatory system over the nation's wireless telecommunication network, where the FCC has broad authority while states retain some powers. Chris D. Linebaugh & Eric N. Holmes, *Stepping In: The FCC's Authority to Preempt State Laws Under the Communications Act*, Cong. Rsch. Serv. (May 12, 2025), https://www.congress.gov/crs-product/R46736. The FCC is permitted to preempt state laws that conflict with its regulatory action when acting within its statutory authority, but this is a Supremacy Clause operation, not a jurisdiction-stripping mechanism. *E.g.*, *Cohen v. Apple Inc.*,

46 F.4th 1012, 1027 (9th Cir. 2022). Courts therefore treat the Communications Act preemption defense as a question of statutory conflict, not of judicial power. *See, e.g., id.* at 1026; *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010); *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1039–40 (9th Cir. 2010). T-Mobile's preemption defense is thus not a question of jurisdiction, but an affirmative defense governed by Federal Rule of Civil Procedure 8(c).

As such, Plaintiffs argue that T-Mobile waived its preemption defense when it failed to plead the defense in its original answer, contending that T-Mobile may not "lie in wait" to resurrect a defense it was required to disclose at the outset of litigation. (Doc. 124 at 7–8; *see* Doc. 4 at 10–12). The Court disagrees.

Under Federal Rule of Civil Procedure 8(c), affirmative defenses must generally be pled in a defendant's answer to avoid waiver. ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."); *e.g., Day v. McDonough*, 547 U.S. 198, 202 (2006). However, this waiver rule is not absolute when an amended complaint is filed. As the Court explained in its Order on T-Mobile's Motion to Dismiss (Doc. 103 at 6–9), the Ninth Circuit recognizes that "[a] defendant is not required to file a new answer to an amended complaint when the allegations in the amended complaint do not change the theory or scope of the case," thereby preserving any affirmative defenses already asserted. *KST Data, Inc. v. DXC Tech. Co.*, 980 F.3d 709, 715 (9th Cir. 2020) (citation

9

modified). Yet, when a plaintiff alleges new matter, or changes the theory or scope of the case, then a responsive pleading is permitted. *Brooks v. Caswell*, No. 3:14-cv-01232, 2016 WL 866303, at *1 (D. Or. Mar. 2, 2016); (Doc. 103 at 7). It likewise follows that a defendant is permitted to assert an affirmative defense against those new matters or theories.[3] *Cf. Moore v. Chase, Inc.*, No. 14-cv-01178, 2016 WL 866121, at *6 (E.D. Cal. Mar. 7, 2016) (concluding that the defendant waived an affirmative defense that was not pleaded in the defendant's answer to the plaintiff's amended complaint).

Here, the Court has already determined that Plaintiffs alleged new matter in their First Amended Complaint (the "FAC").[4] (Doc. 103 at 9). After making this ruling and dismissing Counts 3–5, the Court then ordered T-Mobile to file an amended answer to the FAC, providing T-Mobile with an opportunity to respond to Plaintiffs' amendments. (*Id.* at 15 ("T-Mobile shall have 14 days from the date of this Order to file its answer to the First Amended Complaint.")); *see* Fed. R. Civ. P. 15(a)(2) ("[A] party may amend its pleading with . . . the court's leave . . . when

---

[3] Plaintiffs cite no persuasive authority supporting their argument that an affirmative defense cannot be raised for the first time in response to an amended complaint that makes additional factual allegations. *See, e.g., Satanic Temple, Inc. v. City of Scottsdale*, 423 F. Supp. 3d 766, 779 (D. Ariz. 2019).

[4] Although the prior ruling was primarily focused on Counts 3–5 (the dismissed claims), Plaintiffs do not now contend that the FAC contains the same material allegations with respect to their remaining claims (Counts 1, 2, and 6) as the original complaint. Indeed, the FAC nearly quadrupled the length of the original complaint and contains extensive new factual allegations and discovery disputes related to all claims. (*E.g.*, Doc. 41 at 24–31, 59–61).

justice so requires."). It is in this court-ordered answer that T-Mobile asserted its preemption affirmative defense. (Doc. 111 at 9–10, 13, 15). Having acted by leave of Court and without legal authority instructing otherwise, there is no reason to conclude T-Mobile waived its preemption defense for raising it for the first time against Plaintiffs' FAC.

Nor is there any basis to conclude that T-Mobile's failure to disclose any witness or factual evidence in support of preemption warrants precluding it from asserting a preemption defense. (Doc. 124 at 9–12). Generally, a party must disclose witnesses and other information that the party may use to support a defense. Fed. R. Civ. P. 26(a)(1)(A)(i)–(ii). If a party fails to adequately disclose under the Rules, the witnesses or information may be precluded from use "on a motion . . . unless the failure [to disclose] was substantially justified or is harmless." *Id.* 37(c)(1).

In this case, however, the Court determines that a "finding of preemption is an issue of law," not fact. *See Taing v. Boeing Co.*, 50 F. App'x 807, 808 (9th Cir. 2002) (citing *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 213 (1985)). Thus, the applicability of preemption does not depend on witness testimony or record evidence.[5] As discussed below, courts have found that if state law claims "interfere with the nationwide uniformity of [FCC] regulation that is the aim of the

---

[5] For this same reason, the Court rejects Plaintiffs' argument that the Court should deny the Motion for Partial Summary Judgment or defer its decision pending further discovery. (Doc. 124 at 25–26).

11

[Communications] Act," federal law preempts. *Apple Inc.*, 46 F.4th at 1031; *Bennett v. T-Mobile USA, Inc.*, 597 F. Supp. 2d 1050, 1053 (C.D. Cal. 2008).

In light of the foregoing, the Court concludes that T-Mobile has not waived its preemption defense, nor is it barred from asserting it. In this respect, Plaintiffs' Motion to Strike is denied.

### B.    Invoking Preemption

The Court next concludes that, contrary to Plaintiffs' argument, T-Mobile does not need to affirmatively demonstrate compliance with FCC standards as a prerequisite to invoking preemption. (Doc. 124 at 17–21; Doc. 149 at 4–10).

For instance, in *Apple Inc.*, 46 F.4th at 1030, the plaintiffs, "[f]or purposes of appeal[,] . . . concede[d] that Apple's iPhones compl[ied] with the FCC's RF radiation regulations." Regardless of this undisputed fact, the court's preemption analysis was ultimately based on the FCC's regulations themselves, not on Apple's demonstration of compliance.[6] The court held that FCC regulation, which sets upper limits on the levels of permitted RF radiation, would preempt state laws that impose liability based on levels of radiation below the limits set by the FCC. *Id.* at 1030–31. The court noted that allowing state tort law to prescribe lower levels of RF

---

[6] Plaintiffs' citation to the district court's discovery orders requesting that Apple demonstrate FCC compliance is unpersuasive. (Docs. 149-1–149-2). A district court has broad discretion to manage discovery. *Hunt v. County of Orange*, 672 F.3d 606, 616 (9th Cir. 2012). The orders are therefore irrelevant to this Court's assessment of precedential authority.

radiation than those prescribed by the FCC would interfere with the nationwide uniformity of regulation that Congress aims to achieve. *Id.* The court made clear that Apple's compliance with FCC regulation was merely a fatal factor against plaintiffs and in support of preemption, not a prerequisite to asserting the defense. *Id.* at 1030.

*Cohen v. ConAgra Brands, Inc.*, 16 F.4th 1283 (9th Cir. 2021) similarly supports the proposition that proof of FCC compliance is not necessary to invoke a preemption defense. In that case, the plaintiff specifically challenged ConAgra's label compliance with Food Safety and Inspection Services ("FSIS") regulation. *Id.* at 1289. The court therefore required ConAgra to produce evidence that the label had been reviewed and approved by FSIS before preemption could apply. *Id.* Nonetheless, there was no question that if ConAgra satisfied its burden, the plaintiff's claims would be preempted. *Id.* at 1288. Irrespective of the fact that the FSIS regulatory scheme has no overlap with FCC regulations, the allegations in *ConAgra* do not exist in this case. Plaintiffs do not expressly allege that T-Mobile is out of FCC compliance; instead, they merely imply noncompliance and focus primarily on alleged RF-emission harms and safety risks.

Accordingly, the Court concludes that T-Mobile does not need to prove FCC compliance to invoke its preemption defense.

13

*C.      Applying Preemption to Plaintiffs' Claims*

Turning next to preemption, the Court finds that conflict preemption applies to Plaintiffs' claims to the extent their resolution would require "second-guess[ing] the balance reached by the FCC in setting RF emission standards under its delegated authority." *See Bennett*, 597 F. Supp. 2d at 1053.

"The Supremacy Clause provides the constitutional foundation for federal authority to preempt state law." *Apple Inc.*, 46 F.4th at 1027 (citation modified). By operation of the Supremacy Clause, state laws and causes of action may be preempted by federal law in any of three ways: (1) express preemption; (2) field preemption; and (3) conflict preemption. *Id.* Courts within the Ninth Circuit generally apply conflict-preemption principles to RF-emissions claims because allowing states to impose their own safety standards would obstruct Congress's objectives. *See, e.g., id.* at 1030–31; *Bennett*, 597 F. Supp. 2d at 1052–53.

Under the Communications Act, Congress has delegated authority to the FCC "over every technical aspect of radio communication," and granted "broad authority to issue regulations to implement the [Act]." *Farina v. Nokia*, 578 F. Supp. 2d 740, 762 (E.D. Pa. 2008); *see* 47 U.S.C. § 151; *Head v. N.M. Bd. of Exam'rs in Optometry*, 374 U.S. 424, 430 n.6 (1963). Because the technical standard for cellular service is within the FCC's exclusive regulatory domain, a jury verdict declaring unsafe RF-emission levels would "unquestionably trample upon the FCC's authority to

determine the maximum standard for RF emissions." *Farina,* 578 F. Supp. 2d at 762, 769. Indeed, the "essential objective in creating wireless policy is to achieve nationwide compatibility." *Id.* at 763 (citation modified). For these reasons, state laws, including state common law claims, are preempted if they impede the objective of national uniformity.

However, a plaintiff may pursue state law claims that relate to, but do not implicate, matters reserved to the FCC. For example, in *Shroyer*, 622 F.3d at 1038–39, the plaintiff alleged breach of contract, fraud and deceit, and unfair competition, claiming that New Cingular Wireless—which had merged with AT&T—ignored its contractual obligations to provide adequate service coverage and misled the FCC about the merger, which the FCC purportedly would not have approved had it known New Cingular intended to disregard those obligations. New Cingular asserted a preemption defense arguing that the plaintiff's claims challenging the quality and rates of service were areas reserved exclusively to the FCC. *Id.* at 1039. The Ninth Circuit rejected New Cingular's argument with respect to the plaintiff's breach of contract and misrepresentation claims, finding that the plaintiff was "challenging New Cingular's rates and quality of service only insofar as they [were] contrary to the ones to which he had contractual rights or were misrepresented." *Id.* "[The plaintiff was] not asking the court to rule on the reasonableness of a particular rate, and the quality of service [was] only an issue as it relate[d] to . . . the contract on

15

which he sue[d]." *Id.* Thus, the claims that did not "tread on the FCC's exclusive power to regulate rates and market entry" were not preempted. *Id.* The plaintiff's unfair competition claim, on the other hand, was preempted insofar as it alleged unfairness resulting from FCC approval. *Id.*

Here, like *Shroyer*, Plaintiffs' claims are not preempted to the extent they allege that T-Mobile's RF emissions violate their contractual rights, fail to comply with lease-based safety obligations, or otherwise constitute a breach of duty. Plaintiffs have alleged RF-related facts that are directly tied to the elements of their remaining causes of action, and they may present those arguments to the jury. (Doc. 41 at 25–26, 60). Plaintiffs have further represented that the jury will not be asked to determine "whether the FCC's regulatory limitations on radiation emissions are unsafe or insufficient." (Doc. 124 at 14). The Court will hold Plaintiffs to that representation at trial.

However, insofar as Plaintiffs have obscured their operative theories through discovery demands, argument, and expert testimony premised on harmful RF-emission levels and related FCC standards, the Court is compelled to grant T-Mobile's Motion. Plaintiffs' claims are therefore preempted to the degree they pose "a collateral attack on the FCC regulations themselves." *Bennett*, 597 F. Supp. 2d at 1053. In short, the claims are limited to the theories that Plaintiffs assert are "not predicated on any particular level of [RF emissions]." (Doc. 149 at 10).

In this respect, T-Mobile's Motion for Summary Judgment is granted.

D.      *Dispute Over the Site Lease Agreement and RF Emissions*

In its final pages of briefing, T-Mobile argues that Plaintiffs' RF theories of liability also fail as a matter of law because the Agreement presumes, authorizes, and requires the presence of RF emissions.  (Doc. 116 at 29–31 (citing *Martinson v. Thompson*, 667 P.2d 423, 425 (Mont. 1983) (affirming that a lease could not be cancelled for nuisance because the defendant was simply exercising rights the lease expressly granted—"operat[ing] a bar"))).  In opposition, Plaintiffs contend that the Agreement did not contemplate the warning signs on the roof or that RF radiation would be "emitted [from T-Mobile's] cellular equipment."  (Doc. 124 at 23–25).

Given the limited briefing on this issue, the Court's ruling on preemption, and the identification of disputed facts, the Court determines that judgment as matter of law on this issue is not appropriate.  As discussed above, Plaintiffs seek to hold T-Mobile accountable for: (1) its "'want of ordinary care' in withholding and failing to disclose the radiation that would be emitted by its cellular equipment"; (2) its "dishonesty about the conditions its cellular equipment would create at the Strain Building"; and (3) its occupation of an area exceeding the leased Premises.  (*Id.* at 13–14; *see also* Doc. 41 at 25–26, 60).  Plaintiffs may make these arguments to the extent they are rooted in the contractual rights under the Agreement or duties owed under their negligence theory.  Thus, as to Plaintiffs' remaining claims, and in the

17

form in which they are now presented, the Court concludes that genuine issues of material fact preclude summary judgment.

In this respect, T-Mobile's Motion for Partial Summary Judgment is denied.

## VI. Conclusion

For the reasons stated herein, IT IS HEREBY ORDERED that T-Mobile's Motion for Partial Summary Judgment (Doc. 115) is GRANTED in part and DENIED in part, and Plaintiffs' Motion to Strike Defendant's Preemption Affirmative Defense (Doc. 123) is DENIED.

DATED this 29th day of May, 2026.

SUSAN P. WATTERS
United States District Judge